UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL NO. 07-01-DCR

UNITED STATES OF AMERICA                                              PLAINTIFF

VS:            RECOMMENDED DISPOSITION OF MOTION TO SUPPRESS

LEE MURRAY MILLER                                                     DEFENDANT

\* \* \* \* \* \* \*

Defendant Lee Murray Miller moves to suppress evidence in this action. *See* DE# 17. The Grand Jury indicted Miller on counts alleging the possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) and being a felon-in-possession in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1) (ACCA). *See* DE# 1, Indictment. A final count relates to forfeiture of the firearm, pursuant to 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461. *See id.*

Authorities recovered the firearm in question from Defendant's vehicle following a warrantless search. The Government submits that Defendant consented to the vehicle search. Defendant states that he explicitly refused consent. Alternatively, the Government asserts that suppression is not warranted because: a) Defendant impliedly consented to the vehicle search by failing to object; b) a passenger in Defendant's vehicle, acting with common authority, provided valid consent for the search; or c) authorities would have inevitably discovered the firearm pursuant to a valid search incident to arrest.

The Court received briefs, heard argument, and conducted an extensive evidentiary hearing on March 8, 2007 in this matter. *See* DE# 19. The four officers involved in the traffic stop, the

investigating ATF agent, and Defendant himself testified at the hearing. The Court afforded Defendant and the United States a full and fair opportunity to present evidence, tender documents, and make argument. Based on this record, and considering the standards and burdens of production and proof applicable in the suppression context, the Court issues the following recommended findings of fact and conclusions of law.

**I. Testimony Presented**

*Sergeant Derrick House*

The first witness called to testify by the United States was London Police Sergeant Derrick House. He is the officer directly responsible for the traffic stop, and his testimony provides a critical foundation regarding the stop, Defendant's consent, and the vehicle search.

House explained that on or about December 18, 2006, local authorities received a complaint involving a suspected intoxicated driver. *See* DE# 22, Hearing Transcript at 4. While traveling in the area of the complaint, House observed a vehicle swerving into his lane. He decided to follow the vehicle and quickly realized that it matched the description in the complaint. *See id.* House initiated a traffic stop after the car nearly struck another vehicle traveling in the opposite direction. *See id.* at 5.

After he first approached the vehicle, House discussed the complaint and asked the driver, who was Defendant Lee Murray Miller, for his license. *See id.* Defendant explained that he was moving some items for his brother, Raymond Miller, who was the vehicle's only passenger. *See id.* at 5-6. According to House, Defendant stated that police had visited Raymond Miller's residence earlier that day because of a shooting. *See id.* It was the shooting that prompted Raymond Miller to gather his belongings and leave the residence.

2

At this initial encounter, House testified that he believed Defendant was intoxicated. *See id*. at 6. Although he did not detect the odor of alcohol, House recalled that Defendant had a "glassy" look. *See id*. House suspected Defendant was under the influence of intoxicants other than alcohol.[1]

Once backup arrived, House asked Defendant to exit the vehicle, and Defendant continued to discuss the incident at Raymond Miller's residence. *See id*. at 6-7, 10. House asked whether Defendant had consumed alcohol or taken any medication. Defendant denied drinking alcohol, but did admit to using medication due to a back problem.[2] *See id*. at 7.

House next asked if Defendant had any "guns, knives, or needles" on his person or in the vehicle. Defendant replied he did not. House then inquired, "So, you don't mind if I take a look around in it."[3] Defendant answered "no." *See id*.; *see also id*. at 14. As House neared the side of the vehicle, Defendant asserted that he did not own the car.[4] *See id*. at 7-8, 15. House explained to

---

[1] House did not administer any traditional field sobriety tests. *See* Hearing Transcript at 9. But, House firmly believed Defendant was under the influence. In addition to Defendant's "glassy" look, House explained that Defendant appeared lethargic, with eyes drawn and slurred speech–all indicative of intoxication. *See id*. at 18, 20.

[2] House could not recall whether Defendant stated that the medication was over-the-counter or prescribed. *See* Hearing Transcript at 7.

[3] Whether the request to search specifically referred to the interior of the vehicle is not absolutely clear. *Compare* Hearing Transcript at 7 and 14 *with* Hearing Transcript at 16-17. However, defense counsel concedes that the phrasing of the request essentially is not at issue in this case. *See id*. at 70. Defendant contends that he refused to consent to the vehicle search, which implies that he understood the scope of the request. *See id*. Defendant's testimony, and the context of the query, convince the Court that he knew the request was for permission to search the entire vehicle. *See infra*, at 10-11 (discussing Miller testimony).

[4] Defendant did in fact own the vehicle, but House testified that he was unaware of the

3

Defendant that a driver could consent to a vehicle search even if the driver did not own the vehicle. *See id*. at 7-8. According to House, Defendant did not withdraw or revoke his consent after this explanation and did not protest or object to the search at any time thereafter.[5] *See id*. at 8-9.

After Defendant consented, House removed him to the rear of the vehicle with Officer Robinson, the first supporting officer to arrive on the scene. *See id*. at 9-10. House then proceeded to ask the passenger, Raymond Miller, to exit the vehicle. *See id*. at 9. According to House, Raymond inquired "why?" House answered that he is "going to have a quick look around the vehicle," and asked if Raymond had a "problem with that." Raymond Miller answered "no," and may also have indicated that some of the property in the vehicle belonged to him. *See id*. at 9, 17.

Authorities did not search the car immediately after the consent by Defendant and Raymond Miller. House explained that he and Robinson talked with Defendant and Raymond outside the vehicle "for some time." It was at this juncture that Officer Medlock and Kentucky Vehicle Enforcement Officer Greg Reams arrived. *See id*. at 11.

The search commenced following the appearance of Officer Reams. He and House conducted the search. *See id*. at 19. House discovered the firearm at issue in the trunk of the vehicle, beneath a spare tire cover. Reams was standing beside House at the time of the discovery and witnessed House locate the weapon. *See id*. House believes Raymond Miller initially claimed

---

vehicle's ownership at the time of the traffic stop. *See* Hearing Transcript at 15. Although House believes he conveyed the license plate number to dispatch, House did not recall receiving or knowing the registration information. *See id*. at 15-16.

[5] On his second visit to the stand, House further explained that approximately five minutes passed between the initial traffic stop and the request for permission to search Defendant's car. *See* Hearing Transcript at 52-53. According to House, Defendant was not in custody or in handcuffs at the time of his consent. *See id*. at 53. Instead, Kentucky Vehicle Enforcement Officer Greg Reams handcuffed and formally arrested Defendant after the search of the vehicle. *See id*. at 13, 19.

ownership of the firearm. *See id*. at 21-22.

House testified that Officer Reams arrested Defendant at the scene of the traffic stop for operating a motor vehicle under the influence of intoxicants (other than alcohol). *See id*. at 13, 19. House believes Reams handcuffed Defendant and formally effected the arrest after the search. *See id*. at 13; *see also id*. at 38 (testimony of Kentucky Vehicle Enforcement Officer Greg Reams).

*Officer Daniel Robinson*

Following House, the United States called Officer Daniel Robinson, a member of the London Police Department, to the stand. On the date in question, Robinson responded to support Sergeant House after learning through dispatch that House stopped a vehicle in connection with a possible intoxicated driver. *See id*. at 24.

When Robinson arrived, he pulled in front of Defendant's vehicle and approached the passenger side of the car. At that time, House was talking to Defendant, who was still in the car. After a few minutes, House asked Defendant to exit the car. Robinson testified that House initiated a conversation with Defendant, which Robinson could partially overhear. *See id*. at 25.

Robinson stated that House discussed the complaint and the nature of the stop. House then asked if Defendant had any guns, knives, or weapons *in the vehicle*. After Defendant answered no, House asked if he could "look." Defendant said "yes." *See id*. at 26.

Robinson then moved to the back of the vehicle to watch the Defendant. At that time, Defendant informed House that he did not own the vehicle. According to Robinson, House explained to Defendant that he could consent to the search as the operator. *See id*.

5

Following this discussion, House engaged the passenger, Raymond Miller, while Robinson remained at the rear of the vehicle with Defendant. *See id.* at 26-27. Robinson stated that he was present during the search, but did not participate. Instead, Robinson remained with Defendant and Raymond Miller at the rear of the vehicle. *See id.* at 28. According to Robinson, Defendant did not appear upset during the search. Defendant did not ask him or the officers to stop the search and did not advance any complaints. *See id.* at 27-28.

Robinson testified that the traffic stop lasted approximately forty-five minutes to an hour. *See id.* at 27.

### *Officer Randy Medlock*

The third Government witness was Officer Randy Medlock, also with the London police force. After House initiated the traffic stop, Medlock proceeded to the scene. *See id.* at 30.

When he arrived, Medlock stated that House and Robinson were asking the driver and passenger, who were both out of the vehicle, general questions. *See id.* at 30-31. Medlock did not participate in the search, but watched the subjects while House and Reams searched the vehicle. *See id.* at 32. Medlock testified that Defendant did not seem upset during the search and did not complain or ask anyone to stop. Indeed, Medlock stated Defendant was "one hundred percent cooperative with the search." *See id.* at 31-32.

Medlock added that the stop lasted approximately forty-five minutes. *See id.* at 31.

### *Kentucky Vehicle Enforcement Officer Greg Reams*

Kentucky Vehicle Enforcement Officer Greg Reams testified next. Reams was also aware of the complaint involving a possible intoxicated driver, and was observing traffic for the vehicle described. Once House located the vehicle, Reams responded to offer assistance. *See id.* at 34.

Reams testified that he arrived at approximately the same time as Officer Medlock, and explained that the driver and the passenger were outside the vehicle with House and Robinson. According to Reams, House and Robinson were talking with the subjects. *See id.* at 34-35.

Reams was aware of the shooting incident involving the subjects earlier that day, and tried to inform Sergeant House of these circumstances. *See id.* at 35. After relaying the information, Reams observed Officer Robinson administer a field sobriety test to Defendant, which Defendant failed.[6] Following further interaction with Defendant, Reams concluded Defendant was "under the influence of some type of drugs." *See id.* at 35-36.

According to Reams, Defendant admitted that he received a "pain shot" that day due to a back injury. Reams also indicated that authorities located a prescription pill bottle.[7] Although the prescription was issued that day for twelve pills, the bottle was empty. *See id.* at 36.

Reams participated in the vehicle search with Sergeant House. *See id.* at 39. Among other things, Reams recounted that a search of the trunk by Sergeant House produced a "shotgun style firearm." *See id.* at 39-40.

Reams testified that he arrested Defendant after the search for operating a motor vehicle under the influence of an intoxicant. Because Defendant refused to submit to a blood test, the charges included an aggravating circumstance. *See id.* at 36. According to Reams, the results of

---

[6] Officer Robinson did not discuss, in his testimony, that he administered a field sobriety test to Defendant. However, Officer's Robinson testimony was brief and did not present a direct opportunity to discuss this aspect of the investigation. As such, the Court does not perceive an inconsistency between the testimony of Officer Robinson and Officer Reams.

[7] Testimony did not reflect when or where the officers discovered the empty prescription bottle. Reams believed the prescription was for hydrocodone, and Defendant's testimony confirmed it was for Vicodin, a synonymous substance. *See* Hearing Transcript at 36 and 59.

7

the vehicle search did not prompt the arrest. *See id*. at 37. Defendant pled guilty to the DUI charges in state court. *See id*. at 36.

### *ATF Agent Thomas Chittum*

ATF Agent Thomas Chittum was the last Government witness. On the evening of the arrest, Chittum received a phone call from Reams. Reams reported that a "short barrel shotgun" was recovered at a traffic stop following a vehicle search. Reams requested that Chittum respond to the scene. *See id*. at 41-42.

Chittum explained that Defendant and Raymond Miller were standing outside the vehicle with the other officers when he arrived. As a result of the search, authorities had spread several items across the top of the stopped vehicle. Based on the length of the shotgun, Chittum knew that the firearm was illegal. *See id*. at 42.

Chittum initially understood that one of the subjects involved was a convicted felon and another subject was wearing a holster. *See id*. Chittum first believed the investigation would involve only a felon-in-possession issue. *See id*. at 43. He thought Raymond Miller was the focus, at the outset.

Chittum then interviewed Raymond Miller.[8] During the interview, Chittum determined that Defendant (rather than Raymond Miller) was the convicted felon. In addition, Raymond Miller confirmed to Chittum that he consented to a search of the car; that the car contained his possessions; that he owned the shotgun; that he was wearing a holster; and that he owned an accompanying

---

[8] The interview with Raymond Miller was at the scene of the traffic stop, but post-*Miranda*. *See* Hearing Transcript at 43.

handgun that he stuck in the glove box prior to the vehicle search.[9] *See id.* at 43-44. At the end of the interview, Raymond Miller further indicated that Defendant himself had loaded the shotgun into the trunk of the car. *See id.* at 45.

Because Defendant is a convicted felon, his temporary possession of the shotgun would violate § 922. *See id.* at 46. As a result, Chittum wanted to interview Defendant about the shotgun, and directed Reams to contact him after authorities completed the DUI investigation against Defendant. Pursuant to Chittum's request, Reams contacted Chittum once authorities returned to the police department with Defendant. *See id.* at 45. In the interview with Chittum, Defendant confirmed that he transported the shotgun from Raymond Miller's residence to the vehicle. *See id.* at 46.

On cross, defense counsel explored the written investigation report prepared by Chittum. The report reflected that the searched vehicle was registered to Defendant and his mother. Chittum believed he queried the vehicle's registration himself. *See id.* at 48. The report further stated that House obtained verbal consent to search the vehicle from Raymond Miller. The report did not indicate, and Chittum could not recall, whether House stated that he also obtained consent to search the vehicle from Defendant. *See id.* at 48-49.

Chittum explained that House did not mention Defendant's consent because, at that moment, he and House were discussing only Raymond Miller and Raymond's relationship to the firearms. *See id.* at 49. Similarly, Chittum testified that he did not ask Defendant, during the interview, whether he consented to the vehicle search because Chittum did not think or realize that Defendant's

---

[9] Testimony by the officers did not address this second firearm located during the traffic stop and vehicle search. However, the handgun does not impact the charges against Defendant and is not in issue, which explains why the other officers did not discuss the handgun in their testimony.

consent was an issue at the time. *See id.* at 46-47.

### *Defendant Miller*

Defendant testified that House stopped him on December 18, 2006. Prior to the stop, Defendant explained that he was moving his brother's belongings due to an earlier shooting incident at Raymond Miller's residence. *See id.* at 58-59. Defendant admitted that he was swerving, but allegedly because a cell phone call distracted him.[10] *See id.* at 58.

Defendant testified that House asked him for his driver's license, insurance, and registration.[11] *See id.* at 56. At some point, according to Defendant, House directed him to exit the car. House then questioned whether Miller had any "guns, knives, or needles" on his person or in the car. *See id.* at 56-57. House next asked for consent to search the vehicle. Because Defendant was not under arrest and "didn't see any reason," Defendant said he refused.[12] Defendant knew the request was for permission to search the vehicle:

> "Q: Did he ask you for consent to search your vehicle?
>  A: He'd asked me and I told him no[.]"

*See id.* at 57.

According to Defendant, House then approached the passenger, his brother Raymond Miller.

---

[10] Defendant does not challenge the validity of the stop itself or arrest propriety. *See* Hearing Transcript at 67; *see also* DE# 17, Defendant's Motion to Suppress at 1.

[11] House testified that he asked Defendant for his driver's license, but does not believe he also asked Defendant for insurance and registration. *See* Hearing Transcript at 51-52. House explained that he ordinarily does not request these additional items on his first approach because it provides a reason to re-approach the stopped vehicle. *See id.* at 51.

[12] In addition to refusing consent, Defendant's testimony indicates that he did not deny owning the car. Moreover, Defendant confirmed at the hearing that the car is registered in his name and the name of his mother. *See* Hearing Transcript at 56.

Defendant could not hear if House asked Raymond Miller for consent to search the vehicle, but Defendant believes Raymond did consent. *See id*. Although Defendant alleges that he initially refused consent, Defendant agreed that he did not subsequently object or protest to the ensuing search by Sergeant House. *See id*. at 62.

On cross examination, Defendant further admitted that he ingested two Vicodin on the day in question, but explained that the medication was prescribed. *See id*. at 59. Defendant also admitted that police discovered an empty prescription pill bottle in his vehicle, but he could not account for the missing medication. *See id*. at 59-60. Lastly, Defendant conceded that he is facing serious penalties if convicted of the charges alleged in this matter. *See id*. at 60-61.

**II. Analysis**

*Consent*

Warrantless searches are *per se* unreasonable under the Fourth Amendment–subject to specifically established and delineated exceptions. *See Katz v. United States*, 88 S.Ct. 507, 514 (1967); *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994). Consent to search is one such exception. *See Roark*, 36 F.3d at 17; *United States v. Taylor*, 956 F.2d 572, 589 n.14 (6th Cir. 1992). When the constitutionality of a warrantless search rests on consent, the United States bears the burden on this issue, by a preponderance, and must present "clear and positive" evidence of consent. *See United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996). A reviewing court evaluates the totality of the circumstances to assess consent. *See id.*

The issue of consent in this case is almost entirely a matter of credibility. Credibility determinations typically belong to the trial court. *See United States v. Navarro-Camacho*, 186 F.3d 701, 708 (6th Cir. 1999). Where credibility is the "key" issue, as it is here, the Sixth Circuit urges the court that conducts the suppression hearing to indicate its basis for crediting one witness over another when there is a material difference in the testimony. *See United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990).

In this case, two members of the London police force, Sergeant House and Officer Robinson, clearly and positively testified that Defendant consented to the vehicle search. *See* Hearing Transcript at 7, 14, 26. Defendant denies these accounts, and asserts that he unequivocally refused consent because he was not under arrest and "didn't see any reason" to permit the search. *See id.* at 57.

The Court credits the Government's witnesses on this issue. The primary witness–Sergeant House–is a ranking member of the London police force with twelve years of experience. *See id.* at 3-4. Second, Officer Robinson directly corroborated the testimony by Sergeant House concerning Defendant's consent. Robinson also is an experienced law enforcement officer.

Third, the account of the traffic stop and vehicle search by Sergeant House is thorough, specific, and consistent with the testimony presented by the other officers at the scene. Such broad consistency suggests the collective testimony advanced by the officers is reliable and truthful.[13] Accordingly, at least two or more witnesses substantiated the following:

a) Authorities received a complaint regarding a suspected intoxicated driver. Sergeant House

---

[13] The Court notes that the Government invoked Rule 615 in this matter. Even though the Federal Rules of Evidence do not formally apply in this context, the consistent testimony from each separated Government witness assumes added credibility.

responded to the complaint. He initiated a traffic stop involving Defendant's vehicle after observing Defendant's car swerve toward oncoming traffic.

b) Sergeant House approached Defendant, who was the driver and still seated in the car, and engaged in a general conversation with him. Minutes after Officer Robinson arrived, Sergeant House asked Defendant to exit the vehicle.

c) Once Defendant exited, House questioned Defendant whether he had any "guns, knives, or needles" in the car. Defendant answered no. House then asked if he could "look around" the car. House and Officer Robinson then heard Defendant positively consent.

d) House proceeded to the vehicle. At that time, Defendant denied owning the vehicle. House explained to Defendant that he could consent to the search as the operator of the vehicle. Defendant did not revoke his consent or object.

e) House then engaged the passenger, Raymond Miller. Shortly thereafter, Raymond Miller also exited the vehicle. With both Defendant and Raymond Miller out of the vehicle, House and Robinson proceeded to question the subjects near the rear passenger side of the car. At that time, Officer Medlock and Officer Reams arrived at the scene.

f) Reams and House conducted the vehicle search while Robinson and Medlock remained at the rear of the vehicle with Defendant and Raymond Miller. Defendant did not object, complain, or appear upset during the vehicle search. House discovered the firearm at issue in the trunk of the vehicle, concealed beneath a spare tire cover.

g) Reams arrested Defendant, after authorities conducted the search, for operating a motor vehicle while under the influence.

Because of the officers' credibility, the multiple sources of corroboration, the completeness

13

and consistency of the testimony, and the specificity of the descriptions, the Court credits the consent version provided by the Government.

Furthermore, the Court believes its credibility determination withstands the challenges raised by defense counsel. Counsel made much of the fact that House could not recall whether he asked for Defendant's insurance and registration, presumably because the ownership was in dispute and the registration would have easily resolved that issue. *See*, *e.g.*, Hearing Transcript at 67. As Sergeant House testified and explained to Defendant, however, Defendant could consent to the vehicle search as the driver, whether Defendant in fact did or did not own the car. *See*, *e.g.*, *United States v. Eldridge*, 984 F.2d 943, 948 (8th Cir. 1993). Because Sergeant House did not rely on Defendant's ownership as the basis for consent, it is not suspicious that House could not recall whether he asked for Defendant's registration.

Defense counsel also emphasized alleged inconsistency between the testimony of Sergeant House and Agent Chittum's investigation report. According to the report, House informed Chittum that Raymond Miller consented to the vehicle search. The report did not reference whether Defendant himself consented. *See* Hearing Transcript at 48-49. However, the Court believes Agent Chittum's report is merely incomplete, not inconsistent.

House testified that Raymond Miller did consent to the vehicle search. *See id.* at 9, 17. Defendant also believed Raymond Miller consented. *See id.* at 57. Thus, the report is consistent with the testimony. As Chittum explained, the report did not reference Defendant's consent because, at the relevant time, he and House were discussing only Raymond Miller and Raymond's relationship to the firearms. *See id.* at 49. The Court accepts this explanation.

Finally, the Court is not persuaded by Defendant's testimony. As the United States points

out, Defendant, charged as an armed career criminal, is a convicted felon facing severe penalties if again convicted, raising plain bias and credibility issues. *See id*. at 60-61. Moreover, Defendant admitted that he did not protest or object to the search after Sergeant House allegedly ignored his refusal to consent. *See id*. at 62. Indeed, Officer Medlock characterized Defendant as "one hundred percent cooperative with the search," and Sergeant House and Officer Robinson stated that Defendant did not protest or object during the search. *See id*. at 8-9, 27-28, 31-32. Defendant's accommodating attitude after authorities ignored his alleged refusal raises serious questions.[14] On balance, the Court finds Defendant's temperament is more consistent with the testimony of Sergeant House and Officer Robinson, which indicates that Defendant actually consented. *See id*. at 7, 14, 26.

Further, Defendant testified concerning events from a time when he was impaired. Defendant admits he had taken Vicodin, and he pled guilty to the DUI for which authorities arrested him that night. *See id.* at 36, 59. As a factor in credibility, the conceded controlled substance use hurts the Defendant.

In sum, for all of the stated reasons, the Court finds the United States presented "clear and positive" evidence, and concludes, by a preponderance, that Defendant consented to the vehicle search. *See United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996). The Court credits the testimony of the Government witnesses, which establishes Defendant's consent. *See United States*

---

[14] Certainly, the Government must prove consent, and a refusal to consent requires no bolstering. Still, as a circumstantial matter, Defendant's agreeable and complacent demeanor tends to support the version in which Defendant gave actual consent.

15

*v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990).  Defendant's suppression motion should therefore be denied.[15]

Although the Court's credibility determination disposes of Defendant's motion, the Court additionally reaches and rejects the Government's alternative arguments.

*Implied Consent*

The United States reasons that "[e]ven if ... Defendant did not expressly consent to the search of his vehicle, the Defendant's silence in the face of the search is evidence that he impliedly consented to the search of the vehicle." *See* DE# 18, Government's Response at 1-2.  Although federal courts recognize implied consent in limited circumstances, the Court cannot accept this argument considering the testimony presented.

Both sides agree that Sergeant House requested Defendant's consent to search the vehicle. Two Government witnesses testified that Defendant expressly consented.  *See* Hearing Transcript at 7, 14, 26.  Defendant stated that he explicitly refused.  *See id*. at 57.  Thus, if the Court found Defendant did not expressly consent, the only conclusion supported by the record would be that Defendant refused to consent.  The state of the record renders this alternative theory inapposite.

---

[15]

In addition to establishing that authorities obtained the necessary consent, it is also the Government's burden to demonstrate that the defendant's consent was freely and voluntarily provided.  *See Florida v. Royer*, 103 S.Ct. 1319, 1324 (1983). Defendant does not raise an issue concerning this matter, and the Court finds that the consent scenario was not coercive.

Sergeant House initiated a valid traffic stop and asked–not ordered–Defendant to exit the vehicle.  Approximately five minutes after initiating the stop, House requested permission to search the vehicle.  House testified that Defendant was not in custody or handcuffed at the time Defendant granted consent. *See* Hearing Transcript at 52-53.  The request circumstances are unchallenged and supports that Defendant freely consent.

16

*Common Authority*

Next, the Government submits that Raymond Miller's consent was sufficient to authorize the vehicle search under the doctrine of common authority. Common authority is based on:

> [The] mutual use of property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that [either person] has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock*, 94 S.Ct. 988, 993 n. 7 (1974); *see also United States v. Hunyady*, 409 F.3d 297, 303 (6th Cir. 2005). The burden of establishing common authority, as a warrant exception, rests with the Government. *See Illinois v. Rodriquez*, 110 S.Ct. 2793, 2797 (1990).

In its response, the United States observes that Defendant's "vehicle was full of items owned by Raymond Miller." Because Raymond Miller was using Defendant's vehicle and had access to the car, the Government argues Raymond had common authority to consent to the vehicle search.

The Court believes the Government's argument surpasses the limits of the common authority concept. Notably, there is no precedent cited by the Government to support that a passenger attains common authority by loading personal property into another person's vehicle. In the context of vehicle passengers, federal courts generally recognize common authority only when the passenger has some type of possessory interest in the automobile itself–not its contents. *See United States v. Ramirez*, 115 F.Supp.2d 918, 924-25 (W.D. Tenn. 2000)(finding passenger who *owned* a van had a "possessory interest which enabled him to consent"); *United States v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999)(recognizing a passenger who *leased* a vehicle had authority to consent to a search of that vehicle); *United States v. Dunson*, 940 F.2d 989, 994-95 (6th Cir. 1991)(holding both driver and passenger who *borrowed* a vehicle had common authority to consent to a vehicle search)

17

*abrogated on other grounds by United States v. Ferguson*, 8 F.3d 385 (6th Cir. 1993); *United States v. Botchway*, 433 F.Supp.2d 163, 169 (D. Mass. 2006)(concluding a vehicle was *entrusted* to a passenger, and thus common authority to consent existed, because the passenger said the car "belonged to his girlfriend").[16]

At a minimum, a passenger without a possessory interest in the automobile must "show[] particular knowledge about the car and its control or dominion" to establish common authority. *See United States v. Ospina*, 682 F.Supp. 1182, 1185-86 (D. Utah 1988). Even under this formulation, however, the location of Raymond Miller's personal property in Defendant's vehicle does not, by itself, demonstrate dominion and control over the automobile or that Raymond had "particular knowledge about the car." *See id*.

As such, the Court finds the Government's burden lacking as to this alternative theory. The cited basis for common authority–that the vehicle carried Raymond's belongings–does not suffice. *See Rodriquez*, 110 S.Ct. at 2797.

*Inevitable Discovery*

Lastly, the United States contends that the inevitable discovery doctrine should apply if the challenged evidence results from an unlawful search. Under this exception, the state avoids suppression "if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir 2001); *see also Nix v. Williams*, 104 S.Ct. 2501, 2509 (1984).

---

[16] Similarly, the Sixth Circuit has held that a passenger's personal items within a vehicle do not create a legitimate expectation of privacy with respect to the vehicle; thus, a passenger does not, by virtue of personal possessions, have standing to complain about the validity of a search as to the vehicle. *See United States v. Carter,* 14 F.3d 1150, 1153-55 (6th Cir. 1994).

Here, the Government observes, and the testimony demonstrates, that authorities lawfully stopped and properly arrested Defendant on suspicion of DUI. As a result, authorities would have been entitled to search Defendant's vehicle incident to Defendant's arrest on charges unrelated to the challenged evidence. Therefore, the Government concludes the firearm "would have been acquired through lawful means." *See Kimes*, 246 F.3d at 804.

According to the testimony, however, authorities discovered the challenged firearm in the **trunk** of Defendant's vehicle. *See* Hearing Transcript at 19, 39-40. A vehicle search incident to the driver's arrest does not extend to the trunk. *See New York v. Belton*, 101 S.Ct. 2860, 2864, n.4 (1981); *United States v. Baker*, 221 F.3d 438, 443 (3d Cir. 2000). As such, the Government cannot establish that the firearm "would have been acquired through lawful means" based on a vehicle search incident to arrest, even if the Court assumes such a search was inevitable. *See Kimes*, 246 F.3d at 804.

At the very close of the hearing, after submission of proof, the Government additionally proposed that authorities would have discovered the firearm after a lawful **inventory** search because the officers impounded Defendant's vehicle following his arrest. *See* Hearing Transcript at 75-76. A trial record establishing that an inventory search would have followed the seizure of a vehicle, yielding contraband, is sufficient to establish the inevitable discovery exception. *See Kimes*, 246 F.3d at 804; *United States v. Robinson*, 390 F.3d 853, 871 (6th Cir. 2004). Here, the United States raised the issue only as a concluding, proffered theory, which did not arise during the course of briefing or testimony. The evidentiary record simply does not support an alternative finding in support of an inventory search, a matter on which the United States would have the burden.

As a result, the Court finds no basis to apply the inevitable discovery doctrine in this matter.

### III. Conclusion

For the reasons stated, the Court recommends that the District Court **DENY** the Motion to Suppress filed by the Defendant. *See* DE# 17.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute. By agreement of counsel, within five days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court, with any written responses to objections being due and filed within five additional days. *See* DE#20.

This the 22nd day of March, 2007.

Signed By:
*Robert E. Wier* REW
United States Magistrate Judge